UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Fujifilm North America Corporation et al.

v.

Civil No. 20-cv-492-LM
Opinion No. 2022 DNH 134 P

M&R Printing Equipment, Inc. et al

**O R D E R**

Plaintiffs Fujifilm North America Corporation, Fujifilm Specialty Ink Systems Ltd., and Fujifilm India Pvt. Ltd. (collectively, "Fujifilm")[1] bring breach of contract and indemnification claims against M&R Printing Equipment, Inc. and Novus Printing Equipment, LLC (collectively "M&R") and NI Holdings, Inc., f/k/a Novus Imaging, Inc., ("Novus Imaging").[2]  Fujifilm's claims stem from an October 2015 contract with Novus Imaging, pursuant to which Novus Imaging agreed to manufacture commercial printers for Fujifilm and authorized Fujifilm to act as a global distributor of the printers (the "Distributor Agreement").  In the Distributor Agreement, Novus Imaging provided a one-year limited warranty for the printers.

---

[1] Plaintiffs Fujifilm Specialty, Fujifilm North America, and Fujifilm India are all related entities operating under the umbrella of non-party Fujifilm Holdings Corporation.  The record evidence also refers to other corporate entities within the Fujifilm umbrella.  Because it is unnecessary at this juncture to distinguish among these entities, the court, consistent with the parties' briefs, refers to plaintiffs as "Fujifilm."

[2] Defendant Novus Imaging filed a petition for bankruptcy on November 15, 2021.  Pursuant to 11 U.S.C. § 362(a), this action is stayed against Novus Imaging until its bankruptcy proceedings are complete.  The stay against Novus Imaging does not prevent this case from proceeding as to M&R.  See Raudonis as trustee for Walter J. Raudonis 2016 Revocable Tr. v. RealtyShares, Inc., 507 F. Supp. 3d 378, 381 (D. Mass. 2020).

Fujifilm alleges that, after purchasing and installing these printers, it experienced numerous issues and notified Novus Imaging, but Novus Imaging did not repair or replace them as required under the warranty.  In April 2017, M&R purchased Novus Imaging's assets, including Novus Imaging's rights under the Distributor Agreement.  Fujifilm alleges M&R is liable for damages related to the printers because M&R assumed Novus Imaging's rights and obligations under the Distributor Agreement.

M&R now moves for partial summary judgment on its liability for certain damages at issue in this case.  Doc. no. 58.[3]  M&R argues that, with limited exceptions, it did not agree to assume liabilities under the Distributor Agreement for any printers Novus Imaging manufactured prior to April 2017.  Fujifilm objects, arguing that M&R is liable for all damages related to the printers under the Distributor Agreement.[4]  For the following reasons, the court denies M&R's motion for partial summary judgment.

---

[3] After the parties submitted briefing on M&R's motion for partial summary judgment, the court requested additional briefing as to whether M&R was equitably estopped from denying that it had assumed certain obligations under the Distributor Agreement.

[4] Fujifilm also argues that M&R is liable as a successor to Novus Imaging because M&R both expressly and impliedly agreed to assume Novus Imaging's liabilities.  See Bielagus v. EMRE of New Hampshire Corp., 149 N.H. 635, 640 (2003).  Because the court concludes there are questions of material fact as to whether M&R is directly liable for damages related to the printers under the Distributor Agreement, which itself precludes summary judgment, the court does not need to reach the successor liability question.

## STANDARD OF REVIEW

Summary judgment is proper only if the moving party can demonstrate that there is no evidence in the record to support a judgment for the nonmoving party. Borges v. Serrano-Isern, 605 F.3d 1, 5, 8 (1st Cir. 2010); see also Fed. R. Civ. P. 56(a).  If the moving party succeeds in making that showing, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  Borges, 605 F.3d at 5.  In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, must draw all reasonable inferences in that party's favor, and may neither make credibility determinations nor weigh the evidence.  Harris v. Scarcelli, 835 F.3d 24, 29 (1st Cir. 2016); Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014).

## BACKGROUND

The facts are drawn from the record and summarized favorably to Fujifilm.

I.  October 2015: Novus Imaging, Fujifilm, and the Distributor Agreement

Michael Mills founded Novus Imaging in New Hampshire around 2010. Novus Imaging manufactured, sold, and serviced digital and screen-printing equipment.  Sometime before 2015, Novus Imaging introduced a commercial printer

known as the "Synergia" printer.[5]  The Synergia printer was not a household printer.  Rather, its intended customers were commercial printing companies, and its price tag was approximately $350,000 to $400,000.

In October 2015, Novus Imaging and Fujifilm executed the "Distributor Agreement," in which Novus Imaging agreed to manufacture and sell Synergia printers to Fujifilm and granted it the right to sell those printers to third parties. The Distributor Agreement contemplated an ongoing, long-term business relationship between Novus Imaging and Fujifilm.  Fujifilm agreed to purchase a minimum number of printers every year, and Novus Imaging agreed to manufacture and ship the printers to Fujifilm or Fujifilm's customers.  Fujifilm agreed to pay for the printers in increments, starting with an initial deposit.  It would then make subsequent payments upon completion of the manufacturing process and after shipping and installation.

Beyond those basic terms, several provisions in the Distributor Agreement are relevant to M&R's motion for summary judgment.

**Installation and Training.**  Novus Imaging agreed to provide reasonable assistance and technical support for the installation and setup of the first few printers that Fujifilm sold to its customers.  Other than those initial printers, Fujifilm would be responsible for installing the printers on behalf of end users.

---

[5] The printer was also called the "Uvistar Hybrid 320 Printer."  For simplicity, the court uses "Synergia."

**Warranty/Repairs/Service.**  Novus Imaging also provided Fujifilm and its customers certain equipment and service warranties for the printers.  Specifically, Novus Imaging warranted the printers for a period of one year from the date of their installation, alongside an additional six-month warranty for parts repaired or replaced under the warranty.  The warranty required Novus Imaging to repair or replace any nonconforming printers at no cost to the printers' end users, and it established a protocol for bringing warranty claims to Novus Imaging's attention.

The contract also divided responsibilities for servicing the printers between Novus Imaging and Fujifilm.  Fujifilm was required to provide "first level service" to its customers and only escalate issues to Novus Imaging (which provided "second level service") if Fujifilm could not resolve the problem.  If an issue fell outside of the limited warranty, the contract stated that Novus Imaging would charge Fujifilm its standard rates to service the printers and replace any necessary parts.

**Indemnity.**  Section 8 states that Novus Imaging agreed to indemnify Fujifilm for "all actions, suits, claims, demands, losses, damages or other liabilities . . . arising out of or related to: (i) [Novus Imaging's] manufacture, storage, packaging and shipment of the [printers] including, without limitations, Defect Claims, provided that: (1) such [printer] was installed according to [Novus Imaging's] instructions; and (2) such claim for indemnity is not caused by an unauthorized modification to the [printer] or due to the use of" ink or parts not authorized by Novus Imaging.  Doc. no. 58-2 at 11.

**Fujifilm's Right-of-First-Refusal.** Section 12 of the Distributor Agreement granted Fujifilm a right of first refusal to purchase Novus Imaging's assets and business concerns in the event a third party offered to buy them. Novus Imaging agreed to provide Fujifilm notice of any offers, at which point Fujifilm could exercise or waive its right of first refusal. In any event, if Novus Imaging and Fujifilm were unable to reach an agreement on the price and other terms and conditions of the sale within 30 days of the date Novus Imaging provided Fujifilm notice, Novus Imaging was "thereafter free to enter into a transaction to sell all or substantially all of [its] assets . . . to a third party . . . ." Id. at 14.

**Assignment of Rights**. Section 13(c) provided that neither party could "assign any part of [the Distributor] Agreement without the other [p]arty's written consent . . . ." Id. at 15.

II.    Under <u>October 2015-April 2017: Novus Imaging and Fujifilm's Interactions Under the Distributor Agreement</u>

Pursuant to the Distributor Agreement, Fujifilm purchased 14 Synergia printers between 2015 and 2016.[6] Novus Imaging manufactured the 14 printers in 2015 and 2016. Fujifilm installed one of the 14 printers in its "Demo Center" in Illinois in November 2015. Fujifilm sold 8 of the 14 printers to customers around the world, and it installed them at its customers' facilities throughout 2016. Although Novus Imaging manufactured the remaining five printers by the end of

---

[6] This total includes 3 printers that Fujifilm North America had purchased prior to the Distributor Agreement but which are covered under its terms.

2016, Fujifilm does not appear to have sold them.  Three of these printers are currently stored by Fujifilm, while two are stored by M&R.  Fujifilm also paid Novus Imaging deposits for five additional printers that were never manufactured.

According to a Fujifilm service log, Fujifilm first reported issues with its Synergia printers to Novus Imaging in late December 2015.  Over the next few years, Fujifilm reported additional problems with the Synergia printers.  By early 2017, Fujifilm had recorded about 152 issues with the 9 printers it had installed.  It ascribed the problems to a variety of causes, including hardware and software issues, inadequate training, improper use, and lack of proper instruction on how to use the Synergia printers.  Fujifilm contends that some, but not all, of these issues were attributable to Novus Imaging.  Some of the issues, however, stemmed from Fujifilm's customers' use of the Synergia printers and Fujifilm's own failure to provide training to its customers.

Between 2015 and early 2017, Fujifilm exchanged numerous emails, telephone calls and service calls with Novus Imaging about the printers' issues.  Novus Imaging attempted to fix the issues by, for example, sending technicians to service the printers in person, replacing parts, providing service support over email and phone, issuing technical bulletins, holding weekly conference calls with technical staff at Fujifilm, and releasing updated versions of the printers' software.  Novus Imaging did not, however, accept responsibility for all the issues Fujifilm identified with the printers.

Despite these issues, Fujifilm remained committed to purchasing and distributing the Synergia printer.  Fujifilm's executives believed many of the problems were typical for the roll out of a new product.  And, at least outwardly, Fujifilm's executives expressed a belief that Novus Imaging and Fujifilm could resolve the problems.  At the same time, Fujifilm had serious concerns about the Synergia printers, largely based on customer dissatisfaction.  Fujifilm was unsure it could commit to developing and selling the printer if the issues were not resolved. Ultimately, Fujifilm only purchased 14 Synergia printers, even though the Distributor Agreement contemplated the company purchasing approximately 21 printers in the first year, and 36 printers every subsequent year.

III.    <u>August 2016-April 2017: Novus Imaging Negotiates the Sale of its Assets</u>

In the late summer of 2016, while Novus Imaging and Fujifilm continued their relationship under the Distributor Agreement, Novus Imaging began discussing the sale of its assets to M&R.[7]  At the time, M&R was involved in the screen-printing industry but wanted to expand into the digital graphics market. Because Novus Imaging had digital graphics printers within its product line, including the Synergia printer, M&R was interested in partnering with Novus

---

[7] Non-party M&R Group Holdings, Inc., is a parent company of both M&R defendants.  In their briefs, the parties refer to the entire M&R-family of businesses collectively as "M&R" without always distinguishing between the specific entities. Because it does not affect the analysis, the court refers to the entire M&R corporate family as "M&R" in this order.

Imaging.  A major part of Novus Imaging's appeal to M&R was the opportunity to manufacture and sell Synergia printers to Fujifilm under the Distributor Agreement, including the potential for growth in that relationship.  For its part, Novus Imaging was enticed by the potential partnership because of M&R's superior customer support, sales experience, and reach, all of which could help Novus Imaging expand and improve its business.  In addition, M&R had significantly more manufacturing capacity, which could reduce Novus Imaging's manufacturing costs.

As part of the plan to partner with Novus Imaging, throughout the month of October 2016, M&R and some of their investors collected information about Novus Imaging's business operations, including its finances, products, employees, and business relationships.  By December 2016, M&R and Novus Imaging had outlined the general terms of a deal wherein M&R would purchase all of Novus Imaging's assets, including its trade name, its product lines, and the rights to its distributor agreements.  After the acquisition, M&R would operate Novus Imaging's printer manufacturing and sales business under the "Novus" name.  As part of this plan, M&R intended to hire Mills and all of Novus Imaging's employees to continue in their old roles.  M&R continued its due diligence and worked to obtain financing for the purchase into the early part of 2017.

IV.   <u>Communications with Fujifilm About the Potential Acquisition</u>

As noted, a driving force behind M&R's desire to partner with Novus Imaging was the Distributor Agreement and relationship with Fujifilm.  Accordingly, M&R placed great importance on maintaining a positive relationship with Fujifilm.  M&R

authorized Mills to discuss the acquisition with Fujifilm (albeit without disclosing confidential information about the negotiations).  Moreover, under the terms of the Distributor Agreement, Novus Imaging needed Fujifilm to agree to any assignment of that contract and waive its right of first refusal.

Mills testified that, to this end, he kept a Fujifilm executive "in the loop from the very beginning when we started looking at a merger with M&R."  Doc. no. 67-22 at 41.  According to Mills, a Fujifilm executive indicated early on that the company would waive its right of first refusal and that it supported a deal between Novus Imaging and M&R because M&R's greater capacity might help resolve the issues with the Synergia printers.  For his part, Mills told Fujifilm that a major part of the acquisition plan was to continue the Distributor Agreement.

In a December 2016 letter to Fujifilm, Mills explained that, while negotiations over the acquisition were ongoing, the plan with M&R was for Novus Imaging or "the surviving entity" to continue to serve Fujifilm under the Distributor Agreement.  Doc. no. 67-4.  According to Mills, M&R told him to send this letter to assure Fujifilm that Novus Imaging and M&R were not going to back out of the Distributor Agreement regardless of whether the acquisition went forward.

A few days later, Fujifilm executed a waiver agreement, drafted by Novus Imaging, which states in relevant part:

> . . . Section 12 of the Distributor Agreement provides the Distributor with certain rights in connection with a sale transaction involving the Manufacturer.  Consistent with the requirements of Section 12, Manufacturer has notified Distributor on a confidential basis that it is in negotiations with [M&R] concerning a potential sale transaction within the scope of Section 12.

> By execution of this letter, Distributor, for itself and its affiliates, hereby irrevocably waives and releases any and all rights under Section 12 of the Distributor Agreement to acquire the business, assets or capital stock of the Manufacturer, and consents for all purposes of Section 12 of the Distribution [sic] Agreement to a sale of substantially all of the assets of the Manufacturer to M&R upon such terms as may be agreed by the parties, all without any further consent, approval or notice to Distributor. . . .

Doc. no. 14-1.

In February 2017, representatives from Fujifilm and M&R met to discuss the transaction. At that meeting, Fujifilm raised some of the issues that it had experienced with the printers, and M&R's president replied that M&R was "committed to addressing the problems that Fujifilm and its customers were experiencing with the [p]rinters after [it] acquired Novus Imaging." Doc. no. 67-50. M&R also stressed the benefits of combining Novus Imaging with their manufacturing and quality control expertise to improve the manufacturing and servicing of the Synergia printers.

After the meeting, a Fujifilm employee sent an email to M&R that stated:

> Clearly we understand the synergies between Novus and M&R . . . . It was very evident that combining [Mills's] design and wide format experience with your manufacture and quality control skills can result in a[] valuable and long term partner for Fujifilm.

> As we discussed we currently have a hesitation in sales for the [Synergia printer] based primarily on a combination of historical and more recently minor technical issues and a resulting lack of confidence in the sales teams.

> This is not unusual in the early introduction of a product but it is clear we need to push through this phase. Our current plan is to continue to

push hard for sales and with your assistance address some of the perceived credibility issues with the team.

Doc. no. 67-15.

Fujifilm and M&R had another meeting in March 2017. As with the February 2017 meeting, M&R's president stated that they were "committed to addressing the problems that Fujifilm and its customers were experiencing with the [p]rinters . . . ." Doc. no. 67-51.

After each of the meetings, M&R took several actions related to "addressing the problems" that Fujifilm was experiencing. After the February 2017 meeting, for example, an M&R employee began to attend weekly calls between Novus Imaging and Fujifilm to discuss issues with the printers. And, the day after the March meeting with Fujifilm, M&R asked Fujifilm for a list of problems, explaining that they intended "to address these immediately with Mike Mills and his team as well as our staff. The sooner we get the list the faster we can respond." Doc. no. 67-14.

V.    The Asset Purchase Agreement

On April 18, 2017, after months of negotiations and due diligence, M&R entered into an agreement—the "Asset Purchase Agreement"—with Novus Imaging and its stockholders. M&R bought virtually all of Novus Imaging's assets, including its equipment, real estate, intellectual property, the "Novus Imaging" tradename, and, critically, its rights under the Distributor Agreement. In exchange, M&R paid Novus Imaging $2.3 million. In addition, Novus Imaging was entitled to receive an

"earn-out payment" if, after three years, revenue from the Novus product line met certain levels.

As pertains to the motion for summary judgment, the most important provision in the Asset Purchase Agreement was Section 2.1(c)—titled "Assumed Liabilities." Section 2.1(c) states that subject "to the terms and conditions set forth in this Agreement, Buyer will assume only the following specific Liabilities of [Seller], and no others . . ." Doc. no. 58-13 at 19. Among the enumerated liabilities were:

> (i) the Liabilities of Seller under the Assumed Contracts that accrue after the Closing and that do not arise from occurrences, circumstances or events occurring or existing, or breaches existing, on or prior to the [closing date]; . . .

> (iii) any Liability for customer warranty claims arising out of, relating to, or in connection with any product of [Novus Imaging's business] that is manufactured following the Closing; [and]

> (vi) any Liability for customer warranty claims arising out of, relating to, or in connection with, any product of [Novus Imaging's business] manufactured prior to the Closing but only to the extent that Buyer[s'] cost to provide such warranty services in any annual period does not exceed $200,000 . . .

Doc. no. 58-13 at 19-20. There is no dispute that, through other provisions in the Asset Purchase Agreement, M&R assumed liability for the deposits Fujifilm had paid Novus Imaging for printers that were not yet manufactured at the time of the closing.

Similarly, Section 2.2(a) states that the "Buyer shall not become the successor to Seller" and that:

[N]either Buyer nor any its Affiliates shall assume or become liable to pay, perform or discharge any Liability whatsoever of Seller, whether or not relating to any of the [assets it acquired in the Asset Purchase Agreement] or [Novus Imaging's business and operations], whether known or unknown, fixed or contingent, accrued or unaccrued, except for and to the extent those Liabilities are expressly included in the definition of Assumed Liabilities in Section 2.1(c).

Doc. no. 58-13 at 20.  Section 2.2(b) includes a non-exhaustive list of liabilities that M&R was not assuming, including:

(xii) any Liability arising out of or relating to services and/or products of Seller or any predecessor(s) or Affiliate(s) of Seller to the extent provided, developed, designed, manufactured, marketed, sold and/or distributed prior to the Closing (including, without limitation, Liability for customer warranty claims arising out of, relating to, or in connection with any product of the Business that is manufactured prior to the Closing to the extent not assumed pursuant to Section 2.1(c).

(xiii) any Liability under any Assumed Contract which arises after the Closing but which arises out of or relates to any breach or alleged breach that occurred prior to the Closing, except for those liabilities expressly assumed by Buyer pursuant to Section 2.1(c).

Doc. no. 58-13 at 21.  Subject to these limitations on liabilities, the Asset Purchase Agreement assigned the Distributor Agreement to M&R.

It is undisputed that M&R did not seek Fujifilm's prior written consent for that section of the Asset Purchase Agreement in which M&R accepted only limited liability under the Distributor Agreement for the 14 printers in dispute in this lawsuit.  It is also undisputed that Fujifilm was not aware of the terms in the Asset Purchase Agreement limiting liability until after it filed this lawsuit.

VI.   Post-Asset Purchase Agreement Relationship

Because M&R acquired the right to the "Novus Imaging" name in the Asset Purchase Agreement, Novus Imaging changed its name to NI Holdings, Inc.  After the execution of the Asset Purchase Agreement, NI had no employees, no products, no facilities, no customers, no revenue, and no assets other than cash, including the $2.3 million received under the Asset Purchase Agreement.  NI distributed the proceeds from the sale to its shareholders shortly after the closing of the Asset Purchase Agreement.  After the closing, NI existed solely to distribute potential future "earn-out" payments under the Asset Purchase Agreement to its shareholders.  Because the sales requirements for the earn-out payments were never satisfied, NI did not receive these payments.  It filed for Chapter 7 bankruptcy in November 2021.

The day the Asset Purchase Agreement was executed, April 18, 2017, M&R issued a press release announcing the acquisition of Novus Imaging.  In that press release, M&R stated: "We're looking forward to combining our manufacturing, service, and sales resources with Novus Imaging to provide greater access to equipment and enhanced levels of service and support for current and future Novus customers."  Doc. no. 67-24.  That same day, Mills sent an email to Fujifilm in which he stated that the acquisition "was a very good thing for our growth as a company . . . ."  Doc. no. 67-25.  Mills intended this email to convey that the acquisition would improve the relationship with Fujifilm, improve the manufacturing process for Synergia printers, and allow for better service for the printers.

15

Also on April 18, Mills signed an employment contract to serve as "President of [M&R's] Novus business segment." Doc. no. 67-23. All of Novus Imaging's employees started working for M&R. Their roles were essentially the same as when they worked for Novus Imaging. Their email signatures identified their employer as "Novus Division, an M&R Company."

Almost immediately after the closing the parties began having disputes about the printers. On May 17, 2017—just a few weeks after the closing—Fujifilm sent a letter to Mills asserting that its customers had become increasingly frustrated with the problems with their Synergia printers, and that two customers were requesting full refunds. Fujifilm, in turn, asked M&R to fully refund the purchase price for these two printers. The letter contained a chart indicating that, for four of the Synergia printers, there had been over 100 service calls from the customer totaling hundreds of hours in service time for each printer.

Although Mills responded in an email that he wanted to discuss "how we can improve the situation," doc. no. 73-10, he rejected Fujifilm's request for a refund, stating that it was unreasonable under the circumstances. Instead Mills offered M&R's services to refurbish the two printers.

In addition, Mills sent a "Fuji Service Call Analysis" to Fujifilm. This document noted that Fujifilm had reported 152 separate issues with the Synergia printers since 2015. Of those 152 issues, Mills ascribed 25 to hardware and software issues directly related to the printers. According to Mills, the remaining

127 issues were attributable to Fujifilm and its customers, including problems

created by the ink they used, service issues, and inadequate training.

Then, in late June 2017, Fujifilm sent a letter to Mills in which Fujifilm

asserted that, in addition to the 25 issues Mills ascribed to Novus in his analysis, at

least 60 additional issues were "caused by design issues/ functionality, lack of

documentation, training and other issues . . . ." that Novus Imaging was responsible

for under the Distributor Agreement.  Doc. no. 67-26.  The letter demanded that

M&R take several actions to fix the problems and ensure that the Synergia printers

performed satisfactorily as soon as possible and by September 2017 at the latest.

On July 7, 2017, Mills responded in a letter, stating, in part:

> We value Fuji as a distribution partner and we are anxious to find a
> way to make the path forward more efficient and lucrative for both
> parties.  We have reviewed the data and have gone through the list of
> issues that you have provided.  I have attached to this document a
> response to the issues listed with corrective action taken, in progress
> or other information pertinent to the specific points.  Given the proper
> communications and feedback we should have no issue in resolving the
> open issues by September as you request.

Doc. no. 67-28.  At the same time, however, Mills reiterated his position that the

vast majority of the 152 issues with the printers were Fujifilm's fault.  He further

noted that, at the time he sent his letter, there were only four open issues left to

resolve.  Mills also agreed to several of Fujifilm's other requests, including regular

service calls with Fujifilm technicians.

M&R continued to provide new and spare parts and continued to service the

printers with the same equipment and vendors that Novus Imaging had used before

the acquisition.  These actions included conducting weekly service calls with

Fujifilm technicians and visiting Fujifilm's Synergia customers.  They also continued to install Synergia printers for Fujifilm's customers.  For example, in September 2017, one of their employees traveled to India to install a printer.

What happened to the relationship between September 2017 and April 2020, the date Fujifilm filed this lawsuit, is not clear from the record.  The parties apparently continued their relationship for some time, although M&R was never able to resolve the issues with the printers to Fujifilm's and its customers' satisfaction.  By April 2020, when plaintiffs filed this lawsuit, all of the customers who had purchased Synergia printers from Fujifilm had returned them.

VII.   Claims and Damages

Fujifilm alleges that M&R and Novus Imaging breached the Distributor Agreement by, among other things, failing to fix the printers Fujifilm sold to its customers, failing to accept the return of the printers and refund their purchase price, failing to honor the service and warranty obligations, failing to refund deposits for printers Fujifilm ordered but that were never manufactured, and failing to indemnify Fujifilm for losses related to defects in the printers.  For the alleged breaches of contract, Fujifilm seeks the following damages:

(1) Refunds for the 14 printers they purchased;
(2) Costs for spare parts they purchased to repair the printers;
(3) Service costs for the printers;
(4) Costs related to ink royalties they paid;
(5) "Other expenses paid;" and
(6) Refunds of the deposits for printers that were never manufactured.

**DISCUSSION**

M&R moves for summary judgment on certain damages Fujifilm seeks

related to the 14 Synergia printers Fujifilm purchased from Novus Imaging.

Specifically, M&R contends that, under the terms of the Asset Purchase Agreement,

it was: (1) not assuming any liabilities for printers Novus Imaging manufactured

prior to the Asset Purchase Agreement that were out of warranty at the time of the

Asset Purchase Agreement; and (2) only assuming $200,000 of liability per year for

warranty services for printers that remained under warranty at the time of the

Asset Purchase Agreement.  M&R contends that, as a result, they cannot be held

liable for damages related to the 14 printers unless they were under warranty at

the time of the Asset Purchase Agreement.  In response, Fujifilm argues that M&R

is directly liable under the Distributor Agreement for damages related to the 14

printers because M&R assumed all rights and obligations under that contract in the

Asset Purchase Agreement.  Fujifilm further argues that M&R is equitably

estopped from raising the limitations on liabilities in the Asset Purchase Agreement

because they failed to inform Fujifilm about these limitations or obtain its written

consent for the assignment as required under the Distributor Agreement.

The court agrees with Fujifilm that there are questions of material fact as to

whether M&R assumed liability for damages related to the printers and is estopped

from raising the limitations on liability in the Asset Purchase Agreement.  To start,

M&R was assigned the Distributor Agreement, which contains a provision—Section

8—that on its face renders M&R (as assignee) liable to "indemnify" and "reimburse"

Fujifilm "from and against any and all . . . losses, damages, or other liabilities"

19

arising out of the manufacture, storage, etc., of the printers subject to the Distributor Agreement.  Doc. no. 58-2 at 11.  Viewing the evidence favorably to Fujifilm, a reasonable jury could conclude that the indemnification provision covers the alleged damages related to the 14 printers in this case.  At the very least, M&R has not shown as a matter of law that the damages fall outside this provision.

Notwithstanding the indemnity provision, M&R argues it cannot be held liable for any harms beyond what M&R expressly agreed to assume from Novus Imaging under the Asset Purchase Agreement.  Though the Asset Purchase Agreement may otherwise be compelling evidence about the scope of M&R's potential liability, there are questions of material fact as to whether M&R is equitably estopped from using the limitations in the Asset Purchase Agreement against Fujifilm.

Unlike promissory estoppel, "[e]quitable estoppel . . . does not require a promise."  Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 290 (1992).  "Rather, it serves to 'forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon.'"  Id. (quoting 28 Am.Jur.2d Estoppel and Waiver § 28, at 629).  "In other words, a wrongdoer may be estopped from making assertions, even if true, which are contrary to acts and representations previously made which are reasonably relied upon by the wronged party."  Id.  "Significantly, equitable estoppel is applied even when the parties memorialize their agreement in an express contract."  Id.

To successfully claim equitable estoppel, a plaintiff must show that: (1) the defendant knowingly misrepresented or concealed material facts; (2) the plaintiff was ignorant of the truth of the matter; (3) the defendant either intentionally, or through culpable neglect, induced the other party to rely upon the misrepresentation or concealment; and (4) the plaintiff was reasonably induced to rely upon the representation to his or her injury. New Canaan Bank & Tr. v. Pfeffer, 147 N.H. 121, 126 (2001). "Reliance is unreasonable when the party bringing the estoppel claim, at the time of his or her reliance or at the time of the representation or concealment, knew or should have known that the conduct or representation was either improper, materially incorrect or misleading." The Cadle Co. v. Bourgeois, 149 N.H. 410, 418 (2003). "Incorporated into the concept of reasonable reliance is the requirement that the moving party exercise due diligence to learn the truth of a matter relied upon." Id. Whether equitable estoppel applies is a question of fact. Bosonetto v. Town of Richmond, 163 N.H. 736, 743 (2012).

As to the first element (M&R's concealment of material facts), although Mills and M&R told Fujifilm that M&R would be assuming Novus Imaging's roles under the Distributor Agreement, they never told Fujifilm about the Asset Purchase Agreement provision that limited the scope of that assumption. Nor did M&R obtain Fujifilm's written consent for a limited assignment of the Distributor Agreement, as that contract requires.

M&R relies on the language of the December 2016 letter in which Fujifilm waived its rights of first refusal.  Specifically, M&R argues that it placed Fujifilm on notice of the sale of assets, and that Fujifilm signed the letter which states in part:

> By execution of this letter, Distributor, for itself and its affiliates, hereby irrevocably waives and releases any and all rights under Section 12 of the Distributor Agreement to acquire the business, assets or capital stock of the Manufacturer, and consents for all purposes of Section 12 of the Distribution [sic] Agreement to a sale of substantially all of the assets of the Manufacturer to M&R upon such terms as may be agreed by the parties, all without any further consent, approval or notice to Distributor. . . .

Doc. no. 14-1.

This language will provide M&R with an argument at trial that M&R reasonably believed Fujifilm was agreeing to the terms of the sale "all without any further consent, approval or notice to [Fujifilm]."  However, this language references Section 12 of the Distributorship Agreement, which governed Fujifilm's right of first refusal, but does not reference Section 13(c), which applied to assignments of the Distributor Agreement.  And, section 13(c) requires that Fujifilm provide its written consent prior to the assignment of any part of the Distributor Agreement.  Notably, in a January 2017 evaluation of the transaction, M&R itself noted that its deal team still needed to obtain Fujifilm's approval to assign the Distributorship Agreement to M&R.  Doc. no. 67-10 at 8.

Viewed favorably to Fujifilm, a jury could find that, although Fujifilm waived its right of first refusal under Section 12 of the Distributor Agreement in this letter, Fujifilm did not provide written consent for the assignment of the Distributor Agreement as required under Section 13(c).

The failure to obtain Fujifilm's prior written consent did not occur in a vacuum.  Both Mills and M&R made numerous representations—both before and after the execution of the Asset Purchase Agreement—that could have led Fujifilm to reasonably conclude M&R had assumed all of Novus Imaging's obligations under the Distributor Agreement.  For example, in December 2016, prior to the Asset Purchase Agreement, Mills, on behalf of M&R, assured Fujifilm that it was his and M&R's intent that M&R would continue Novus Imaging's role under the Distributor Agreement.  In both February and March of 2017, M&R assured Fujifilm at meetings with top executives that they were committed to fixing the issues with the printers after they acquired Novus Imaging's assets.  At the same meetings, M&R also attempted to persuade Fujifilm that it would benefit from the acquisition because M&R's greater manufacturing and service capacities would be helpful in resolving the ongoing issues with the printers.

Further, immediately after executing the Asset Purchase Agreement, M&R issued a press release reiterating that the acquisition would help improve the manufacturing process and provide better service to Novus Imaging's former customers.  Mills also sent an email to Fujifilm stating that the acquisition was good news for Fujifilm.  And, during the summer of 2017, Mills, now an employee of M&R, assured Fujifilm that M&R would attempt to resolve any ongoing issues with the printers in a timely manner.  Notably, M&R never qualified its representations by stating that that they were only partially assuming Novus Imaging's obligations under the Distributor Agreement for the 14 printers.  Viewed in the light most

23

favorable to Fujifilm, a reasonable factfinder could find that M&R both concealed the limitations on the assignment from Fujifilm and made numerous representations that, coupled with this concealment, reasonably caused Fujifilm to conclude that M&R assumed all of Novus Imaging's obligations under the Distributor Agreement.

The second element (Fujifilm's knowledge of the facts) is easily established on this record. It is undisputed that Fujifilm did not become aware of the limitations on liability until it obtained the Asset Purchase Agreement during discovery in this case.

As to the third element (M&R's culpable neglect), a reasonable factfinder could find for the reasons already stated that M&R's failure to inform Fujifilm about the limitation on liabilities constituted culpable neglect. In particular, Fujifilm was required to consent in writing to any assignment of that contract. Yet M&R failed to ensure that Fujifilm provided written consent for the assignment, despite altering its obligations under the Distributor Agreement by limiting its assumption of liabilities. And for the reasons stated, the record viewed favorably to Fujifilm shows that M&R's failure to obtain Fujifilm's prior written consent occurred while M&R made representations that induced Fujifilm to believe that M&R was assuming all obligations under the Distributorship Agreement.

Finally, as to the fourth element (Fujifilm's injury), a reasonable factfinder could find that Fujifilm suffered an injury because of its reliance on M&R's actions and statements. The record reveals that Fujifilm did not become aware of the

limited assignment until after Novus Imaging distributed its remaining assets (i.e., the proceeds from the sale to M&R) and became effectively judgment proof. A reasonable factfinder could conclude that Fujifilm failed to pursue legal action against Novus Imaging before Novus Imaging became effectively judgment proof because of Fujifilm's reliance on M&R's actions and statements.

Viewed favorably to Fujifilm, there are material facts in dispute on the question of whether M&R is equitably estopped from using the Asset Purchase Agreement to shield it from obligations it otherwise appeared to assume under the Distributor Agreement. See Great Lakes Aircraft Co., 135 N.H. at 290.

M&R argues that Fujifilm cannot—as a matter of law—have reasonably concluded that they were assuming all the obligations under the Distributor Agreement because Fujifilm failed to exercise due diligence. M&R contends that the undisputed facts show that Fujifilm's right of first refusal gave it the right to learn about the terms of any sale of Novus Imaging's assets to M&R. But, according to M&R, Fujifilm failed to take advantage of this opportunity and instead waived its right of first refusal without inquiring into the specific terms of the deal between M&R and Novus Imaging. However, the question of whether Fujifilm failed to exercise due diligence in learning about the scope of any assignment is question of fact not suited for resolution on a motion for summary judgment. Bosonetto, 163 N.H. at 743.

M&R also argues against estoppel on the grounds that, under the terms of the Distributor Agreement, Fujifilm was not required to provide separate written

consent under Section 13(c) for any assignments associated with a sale of assets that triggered Section 12. This argument presumes that the contractual language is unambiguous on this point. It is not.

As an initial matter, Section 13(c) states that, unless the assignment of rights was to a parent, subsidiary or affiliate, Fujifilm was required to provide written consent to any assignment. This broad language does not limit what assignments fall within its provisions or state that written consent was not required if the assignment was part of a transaction that triggered Section 12.

Additionally, Section 12 and Section 13(c) do not appear on their face to overlap or conflict. It is reasonable to read these provisions as conferring separate rights to Fujifilm that would both apply in this circumstance. That is, Section 12 addresses Fujifilm's right of first refusal in the event Novus Imaging sold its assets or rights to manufacture the Synergia printers. Section 12 says nothing, however, about approving the actual terms of that assignment. Section 13(c), by contrast, concerns Fujifilm's right to consent in writing to any assignment of the Distributor Agreement. The language of the contract at least permits Fujifilm to argue that its decision to waive its right of first refusal under Section 12 does not mean it consented under Section 13 to any assignment of the Distributor Agreement to that third party. In such circumstances, Fujifilm could argue that the contract permitted it to waive its right of first refusal but retain its right to object to, for example, partial assignments that affected its rights under the Distributor Agreement.

At the very least, the language is ambiguous on these questions.  And, where a contract is ambiguous, "it must be determined, under an objective standard, what the parties, as reasonable people, mutually understood the ambiguous language to mean."  Birch Broad., Inc. v. Capitol Broad. Corp., 161 N.H. 192, 196 (2010). Although the intentions of the parties at the time of the contract's formation are determinative, those intentions may be inferred from the situation of the parties and their actions after the contract was executed.  Id. at 197.  This inquiry necessarily involves factual findings.  Id.

The language of Section 13(c) in the Distributor Agreement is broadly written.  Viewed favorably to Fujifilm, a reasonable factfinder could determine that the parties intended Section 13(c) to apply to asset sales that triggered Section 12.

In sum, viewing the facts in Fujifilm's favor, a reasonable factfinder could determine that M&R is liable for the alleged damages related to the 14 printers under the terms of the Distributor Agreement and that M&R is equitably estopped from using the Asset Purchase Agreement to limit its liabilities.  M&R has therefore failed to show that it is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, M&R's motion for partial summary judgment (doc. no. 58) is denied.  In addition, Fujifilm moves for leave to file under seal certain exhibits in support of both its objection and surreply.  Doc. nos. 66, 75.  Specifically, it seeks permission to file under seal six documents (doc. no. 67-10, 67-16, 67-18, 74-10, 74-16, and 74-18).  These exhibits pertain to M&R's confidential and sensitive

27

business information, and three are duplicative.  Given the limited request and the

sensitive nature of the documents, the court grants doc. nos. 66 and 75.  See Nixon

v. Warner Comms., Inc., 435 U.S. 589, 598 (1978) (noting that in general, "courts

have refused to permit their files to serve . . . as sources of business information

that might harm a litigant's competitive standing").

      SO ORDERED.

_____
Landya McCafferty
United States District Judge

October 24, 2022

cc:    Counsel of Record